(119 App. Div. 75)

### McDONALD v. TRIEST et al.

(Supreme Court, Appellate Division, Second Department. April 26, 1907.)

**1. MASTER AND SERVANT—DUTY TO WARN SERVANT—LATENT DANGER.**

Where the alleged danger of being poisoned in the sorting of broken vanilla beans was not necessarily attendant upon the doing of the work, the employer was not negligent in failing to warn an employé of that danger, unless he knew, or in the exercise of due care could have known, thereof.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 34, Master and Servant, § 311.]

**2. SAME—ACTION FOR INJURIES TO EMPLOYÉ—EVIDENCE—SUFFICIENCY.**

In an action by an employé, alleged to have been poisoned in the work of sorting broken parts of vanilla beans, evidence *held* insufficient to establish that the master knew, or by the exercise of due care could have known, that there was danger of being poisoned in doing the work.

Appeal from Municipal Court, Borough of Brooklyn, Seventh District.

Action by Florence McDonald, an infant, etc., against Hans Triest and another. From a judgment for plaintiff, defendants appeal. Reversed, and new trial ordered.

Argued before HIRSCHBERG, P. J., and WOODWARD, JENKS, RICH, and MILLER, JJ.

Arthur A. Michell, for appellants.
William H. Good, for respondent.

JENKS, J. The action is for negligence by servant against master. The servant, a woman aged 19, worked at sorting broken parts of vanilla beans, called "cuts," in the warehouse of the defendants, who imported the beans from Mexico in large tin boxes. The plaintiff, who had no previous experience, testifies that after two weeks her skin itched, and then a red swelling or an eruption of small blisters appeared on her arms, head, neck, and breast. She quit work for six weeks and called in a physician, who cured her. She returned to work, and the eruption reappeared. The theory of the plaintiff is that this disease was caused by a poisonous substance with which she came in contact when at this work. Her case is that she was wholly ignorant of this substance, but that her master well knew that the work was thus dangerous, but failed to notify her. In Mather v.

Rillston, 156 U. S. 391, 399, 15 Sup. Ct. 464, 467, 39 L. Ed. 464, the court, per Field, J., say:

"If persons engaged in dangerous occupations are not informed of the accompanying dangers by the promoters thereof, or by the employers of laborers thereon, and such laborers remain in ignorance of the dangers and suffer in consequence, the employers will also be chargeable for the injuries sustained."

Thompson on Negligence thus states the principle:

"It is the duty of the employer to warn his servant with respect to latent dangers known to the employer or discernible by him in the exercise of reasonable care." Section 4059.

There is no evidence, but the contrary is fairly established, that this danger attended the work of sorting these cuts. Hence this case does not fall within the principle of those cases where the danger necessarily accompanied the mere doing of the work, like the manufacture of paris green (Fox v. Peninsular White Lead & Color Co., 84 Mich. 676, 48 N. W. 203), or of a poisonous liquid (Texas & N. O. Co. v. Gardner, 29 Tex. Civ. App. 90, 69 S. W. 217), or making dinitro benzole (Wagner v. H. Jayne Chemical Works, 147 Pa. 475, 23 Atl. 772, 30 Am. St. Rep. 745). Therefore it was for the plaintiff to show that the master knew, or in the exercise of due care should know, of the alleged latent danger, before she can assert that the master was negligent is not warning her thereof.

The plaintiff made proof of the rash, which her physician said was very similar to the poison of poison ivy; but the proof of the cause is very unsatisfactory, and the proof of the defendants' knowledge, actual or constructive, is weak, and cannot prevail against the evidence of the defendants. The proof of the cause rests upon the testimony of her attending physician, who testifies that he found his patient suffering from active dermatitis; in other words, inflammation of the skin. He said that he knew the cause, which was an irritative oil which had come in contact with the skin, and that he had never seen any similar case. He testifies that he naturally looked into the case with special care. He was asked:

"Q. What species of oil does cause this disease, doctor? A. An oil secreted by an insect, known as the 'anacardium occidentale.' Q. What is that found around? A. Sometimes found mixed with the vanilla bean."

He then testified that he believed this species of skin irritation was not recognized medically:

"Q. What was the statement? A. An oil secreted by this little animal; this little insect; this anacardium occidentale. It is sometimes found mixed with vanilla beans. That oil is a direct irritant to the skin. Q. Is the disease that comes from that oil known and treated medically? A. Yes. Q. So the only thing that is not classified is the connection between the animal and the vanilla bean? A. That is known and recognized."

On cross-examination he testified:

"Q. Is this the first case of dermatitis from anacardium occidentale that you have handled? A. From the oil secreted by the animal. Q. Never met the animal before in practice? A. Really never met him. Q. What is he like? A. I could not say. Q. Never saw it? A. No. Q. Never saw a picture of it? A. Never. Q. Now, you say this particular form of skin disease was caused by oil? A. Yes. Q. And that you swear to, to the best of your opinion; is

that right? A. Upon reputable authorities; yes. Q. Could such disease be caused by acid? A. Yes. * * * Q. Do you go on record here that the trouble of skin disease was not caused by the oil from the vanilla bean? A. This particular case? Q. Yes? A. Yes. * * * Q. Now, tell me how it was caused. Give me the process. A. It was caused by the presence on the skin of the oil secreted by this little insect I speak of. Q. What sort of an insect is it? A. I have given you its name, sir. Q. Is that all you know about the matter, except the name? A. I know that it is found in connection with vanilla beans, and is sometimes known as the elephant louse. Q. Do you know anything about poison from vanilla bean, or from the oil from vanilla bean, or this animal, except what you have read? A. No, sir; I don't know. This is the only case I have ever seen."

After some further discussion, the physician said:

"I know that the irritant is the oil secreted by this little insect."

And again:

"This oil, as I understand it, is secreted by the animal at first, just as you and I perhaps, secrete (sic) several or various things. I don't understand it as being in any way an essential oil of vanilla at all. Q. So you say it is not poison from the oil of vanilla bean, but is poison from oil exuded by the insect? A. Yes. Q. Now, what is that oil? A. It is the oil excreted (sic) by the insect known as 'anacardium occidentale.' * * * Q. In studying up about the vanilla bean, what theory have you in your mind as to how and where the insect comes from? A. I have not any—theory you say? I assume the insect is a habitat of the country where the bean is grown, the place where the bean comes from, and is packed with it. Q. So you think a bean, whether a sound bean or an unsound bean, can still be possessed of this insect? A. Yes. Q. But you don't know? A. I don't know. * * * Q. So that, when this young lady talked about these little things that flew around, you cannot identify him in connection with the anacardium occidentale? A. No."

The witness did not cite, and was not asked to cite, any authorities, and I am not enlightened by the research of either counsel. I am therefore somewhat troubled by this record. On the one hand, there is this testimony of a physician who has given this case careful study, and who repeats and reiterates that the cause of this disease is an insect which is known as "anacardium occidentale." I turn to the American Illustrated Medical Dictionary, by Dorland (1903), and I find this definition:

"Anacardium (an-ah-kar'de-um). (L.; Gr. ana, up + kardia, heart). A genus of tropical trees with a poisonous juice. A. occidentale, the cashew tree, affords the cashew-nut and a useful gum, as well as cardol (q. v.). It is used for leprosy, for destroying corns and warts, and as a vermicide. Dose of tincture, 2-10 min. (O. 133-0. 666 c. c.). An ointment is used as a blistering application."

I find substantially the same definition in Gould's Illustrated Dictionary of Medicine. Referring to the word "cardol," used in the definition supra, as defined in the Century Dictionary, I find:

"Cardol. An oily liquid contained in the pericarp of the cashew-nut (Anacardium occidentale). It is a powerful blistering agent."

I turn in the same book to "cashew-nut," and I find: "The kidney-shaped nut of the Anacardium occidentale." And I find an illustration of a plant or part of a tree, with the words under it "Anacardium occidentale." I then turn to "Anacardium, a genus of shrubs and trees," and under it: "In the cashew-tree (A. occidentale), the prin-

cipal species," etc. And there is another illustration, described as fruit of Anacardium occidentale."

Speaking with all seriousness, here are books, technical and general, of high standard, which describe that which the physician says repeatedly is an insect as a tree or a shrub. The doctor and the dictionaries disagree. It may be that in the march of scientific knowledge he is ahead. It may be that in the confusion of the witness stand he was not correct. It may be that he was repeatedly, again and again, misunderstood. It may be a case of repeated misnomer. It may be that there is an insect of this name, which was not named when these books were published. It may be that the physician was in serious error. But I find this additional feature: The American Cyclopedia states:

"It has been said, in all the cases where poisoning has taken place from ice cream, vanilla has been the flavor employed. It is supposed by Schroff that in these cases the extract has been prepared from parcels of the drug which have been besmeared with cashew-nut oil."

Taylor on Poisons says:

"There is nothing in vanilla to cause poisoning. It contains a crystallizable principle, vanillin or vanillic acid, which is not poisonous (Heiseman Pflanzenstoffe [1871] p. 1038). In order to account for the irritant effects, Dr. Rosenthal believes that there was a production of caradol, an irritant oily principle (found in Anacardium occidentale) somewhat resembling cantharadin."

I am quite clear that the case, upon the evidence adduced as to the insect, is so unsatisfactory that it cannot stand. If the plaintiff retry the case, it may be that the witness can clear away the mist.

If we view the case as resting on the evidence of this witness that the poisoning was due to an oil, yet it is not sufficient to establish that the master knew or ought to know that there was this latent danger. For, inasmuch as the scientific part of the case rested upon the insect theory, the case is naturally defective as to the vegetable oil theory; while, on the other hand, there is, as I have said, evidence that this danger is not attendant upon the work itself. We are left in the dark as to the frequency of such contamination and as to the effect upon the beans, if any, so as to afford notice. There is one other feature, that of the elephant louse, which I shall recur to. When the fragments of the beans taken from the warehouse by the patient were exhibited to the physician, he could not point out the anacardium occidentale.

The plaintiff called Mr. Smeltzer, who had been in the defendants' service. He testified that some time before the plaintiff had come into employment a rash had appeared on his arm, and that he told the defendant that he thought he had been poisoned; but he did not tell in what way, save specifying that it was at work in the warehouse. But the witness admits that he had blood poisoning in his foot before this rash appeared. The defendant testifies that Smeltzer did tell him that he thought the rash or poison came from the beans, but that he gave it no significance, as he knew of the blood trouble. There is some rather vague testimony that a small boy once suffered from a rash. This testimony, taken with that of the plaintiff, who asserts that her sister suffered likewise (although the sister did not testify), constitutes practically all of the evidence in relation to any injuries from

the work or similar work done by the plaintiff. The defendant testifies that he had been in this business for 20 years, and had never known or heard of any case, save those which I have enumerated. He testifies that there is a small parasite, a louse like those found on plants, found on diseased beans; but that it is harmless. His witness Hamilton, a man of 35 years' experience, testifies that he never saw or heard of such a case, save one 15 or 16 years ago, where a workman had a skin eruption which he attributed to the beans; but the man's physician did not believe that they were the cause. The superintendent of the defendant, with 25 years' experience, corroborated his employer and Mr. Hamilton. It seems to me that, as the case does not present the features of danger necessarily incident to the work of handling these vanilla beans or cuts, upon the unsatisfactory proof and the absence of proof that the master knew or ought to know the danger, the judgment was wrong, and that a new trial must be ordered. Interesting and learned discussions of liability may be found in Hysell v. Swift Co., 78 Mo. App. 39. See, too, Lawless v. Laclede Gaslight Co., 72 Mo. App. 679.

Judgment of the Municipal Court reversed, and new trial ordered; costs to abide the event. All concur.